Michael R. King
Special Assistant Attorney General
1625 11th Ave., Middle Floor
POB 200124
Helena, MT  59620-0124
Phone: (406) 444-2403
Fax: (406) 444-2592
Email: mking@mt.gov

*Attorney for Defendants Laura Smith, Jason Larson,
Jenn Weber, Kasia Harvey, Jessica Moorhead, and Steve Bullock*

### UNITED STATES DISTRICT COURT
### DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| KRISSY SANCHEZ,<br><br>                    Plaintiff,<br><br>vs.<br><br>MONTANA DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al*.<br><br>                    Defendants. | CV 18-90-BLG-SPW-TJC<br><br>**DISCLOSURE STATEMENT OF DEFENDANTS LAURA SMITH, JASON LARSON, JENN WEBER, KASIA HARVEY, JESSIC MOORHEAD, AND STEVE BULLOCK** |

## I.    Factual Outline Of Case

Plaintiff is the adoptive mother of SS (an adult), adoptive mother of GS (now age 17) and AS (now age 5).  SS is the natural mother of AS.  Desmon Turner is the adoptive father of GS.  During the events in controversy, Plaintiff was living at 8215 Beas Lane (a rural residence in Shepherd, MT) and Turner was incarcerated in the Yellowstone County Jail.  Plaintiff's natural mother, Lisa

Greenwood, was living in Livingston, MT with her husband, Tim Greenwood (Plaintiff's stepfather).

Between August 16 and August 24, 2017, the Montana Department of Public Health and Human Services (DPHHS) received 12 third-party reports of Plaintiff's abuse and neglect of GS and AS.  As concerns GS, the reports included allegations of verbal abuse, emotional abuse, and physical abuse in the form of being held up by the neck, slapping, slamming head into the wall, kicking, hitting, choking, punching, and hitting with a belt.  GS was reported to be fearful of Plaintiff and suicidal, self-harming, and emotionally unstable as a result of Plaintiff's abuse. Plaintiff's former husband reported Plaintiff had a prior history of meth addiction and that GS told him Plaintiff would make her drink alcohol and smoke marijuana. As concerns AS, the reports included being locked in his room most of the day and being a witness to serious violence in the home between Plaintiff and both GS and Turner (which led to Turner's incarceration).   Based on these reports, Child Protection Specialist Supervisor (CPSS) Christy Ellerbee (Billings) asked Child Protection Specialist (CPS) Erin Clements to assign a courtesy worker from the Bozeman office to interview GS at her boarding school in Bozeman, MT (Mt. Ellis Academy).  Clements assigned CPS Deb Kirby.  During an August 30, 2017 interview, GS confirmed Plaintiff's verbal, emotional, and physical abuse.  GS

reported she had depression, anxiety and an overactive bladder and confirmed self-harm and that she had been admitted to the Billings Psych Center for a week in December 2016.  GS also reported Plaintiff required her to keep AS locked in his room all day, that Plaintiff hit AS too, and that there was black mold and black widow spiders in Plaintiff's home.  Because GS disclosed potential crimes, the Bozeman police conducted a recorded forensic interview of GS on August 31, 2017.  Kirby attended the interview, at which GS made disclosures consistent with those she had made the day before.  Kirby informed Rash that many concerns were raised supporting removal of GS and AS from Plaintiff's custody.  After speaking with Kirby, SS told Rash that Plaintiff also spanks AS with her hands, she had seen Plaintiff abuse another person's prescription narcotics on August 30, 2017, and confirmed the presence of black mold throughout Plaintiff's home.

Some of the third-party reports DPHHS received described Plaintiff as having an itinerant lifestyle and that she had fled Florida with her children to avoid a child abuse and neglect investigation.  By all reports, Plaintiff was behaving erratically and had decompensating mental health problems that were untreated or poorly treated.

On September 1, 2017, Rash drove to Plaintiff's residence to speak to her about the reports of abuse and neglect.  Chris Friedel (of Friedel LLC)

accompanied Rash to perform a drug test if Plaintiff would consent to one (which she did not).  Approaching the house, Rash observed three surveillance cameras in the front windows.  After knocking several times, Plaintiff opened the door and let Rash into the house, but would not allow Friedel in.  Plaintiff denied all of the abuse allegations, but admitted there was black mold in the house that her landlord knew was a problem and had to fix.  She told Rash she understood why DPHHS would want to remove GS from her care, but argued there was no imminent danger as to AS.  Plaintiff became very verbally aggressive, at which point Rash informed her that based on the physical abuse allegations, as well as the black mold and refusal to take an onsite drug test, she would need to place AS in emergency protective custody.  Plaintiff agreed that Lisa Greenwood would be an appropriate placement for AS if she was not someone who had reported her.

As Plaintiff was angrily gathering AS's belongings, Rash exited Plaintiff's residence, expecting Plaintiff to follow with AS.  Instead, Plaintiff shut and locked the door.  Rash immediately called the Yellowstone County Sheriff's Office for emergency assistance.  Deputy McCave arrived and observed Plaintiff looking out the window at him, but she would not answer the door.  Another Deputy asked Rash if she had any concerns about Plaintiff fleeing the scene.  Rash replied she had unconfirmed reports Plaintiff had fled with her children from a child abuse and

neglect investigation in Florida.  Out of concern for Plaintiff's and AS's immediate safety, the Sheriff Deputies forcibly entered Plaintiff's residence and discovered she had, in fact, fled the home with AS.  Rash and the Deputies discussed whether to issue an "Amber Alert" and, to that end, Rash called Greenwood and obtained a photo of AS.  Rash also called SS, who advised that Plaintiff may have gone to a nearby restaurant to make a phone call for a ride.  Sometime later, the Deputies located Plaintiff and AS on a side street near the restaurant, detained her, and called Rash to the scene.  Rash took custody of AS and drove him to Park City where he was placed in Greenwood's care.  Plaintiff voluntarily signed an Out-Of-Home Safety Plan and a Protection Plan for GS and AS to reside with Greenwood.

On September 7, 2017, Rash sent Plaintiff a substantiation letter advising that AS's exposure to violence in the home between GS and Plaintiff along with being locked in his bedroom for long periods of time without supervision met the definition of abuse or neglect found in MCA § 41-3-102.  The letter advised Plaintiff could contest this finding by requesting a fair hearing by October 8, 2017.  Neither Plaintiff nor her attorneys requested a fair hearing.

On September 11, 2017, based on an Affidavit Rash signed reciting *inter alia* the facts set forth above, the Yellowstone County Attorney's Office filed two Petitions for Emergency Protective Services, Adjudication As A Youth In Need Of

Care and Temporary Legal Custody – one for GS and one for AS.  In response to those Petitions, the state district court issued two Orders To Show Cause And Granting Emergency Protective Services setting a show cause hearing on September 19, 2017 and an adjudication hearing on November 13, 2017.  The Orders *inter alia* found that Rash had "sufficient reason to believe that [GS and AS were] in immediate or apparent danger of harm," "there is probable cause to believe [they are] abused or neglected or in danger of being abused or neglected" such that "immediate protection of the child[ren] is required," and that their "removal . . . from the home is necessary because continuation in the home would be contrary to [their] welfare."  The Court *inter alia* ordered that DPHHS "has the right to place the child in temporary . . . out-of-home care," that Plaintiff and Turner "obtain evaluations that may be necessary to determine whether the child[ren are] Youth[es] in Need of Care," that DPHHS had "authority to effectuate any other temporary disposition that may be required in the best interests of the child[ren]," that DPHHS had authority to "authoriz[e] to approve, arrange, and supervise visitation between" Plaintiff, Turner, GS, and AS, that DPHHS had authority to require Plaintiff and Turner to  "obtain chemical dependency evaluations and submit to drug testing through random testing, and that DPHHS determine the amount Plaintiff and Turner must pay "for contribution toward the

cost of out-of-home care for their child and collection of the determined amount." The Court granted DPHHS emergency protective services "pending a hearing in this matter," appointed the Office of Public Defender (OPD) to represent Plaintiff and Turner, and appointed a guardian ad litem for GS and AS. By separate orders entered on December 23, 2017 and December 28, 2017, the district court appointed CASAs for GS and AS.

On September 22, 2017, Deputy County Attorney Corbit Harrington filed a motion to reset the September 19, 2017 show cause hearing due to Plaintiff's counsel having a conflict of interest. The district court reset the hearing for November 13, 2017, ordering that DPHHS "shall continue to have custody of the Youth pending the Hearing." On November 16, 2017, the district court again reset the show cause hearing to February 28, 2018 and March 1, 2018, again ordering that DPHHS "shall continue to have custody of the Youth pending the hearing."

Between the date GS and AS were removed from Plaintiff's custody and the date the two Petitions were dismissed (May 14, 2018), various services were provided to Plaintiff, GS, and AS with the goal of reuniting the family. In October 2017, GS's counselor stated that contact between GS and Plaintiff had been detrimental and resulted in significant emotional distress and physiological responses. Up to and including February 20, 2018, the CASA advised the district

court that GS and AS should not be returned to Plaintiff, that GS and AS were doing well in the Greenwood home, and that reunification of the family should not occur until the family completed family counseling.  Up to and including April 14, 2018, GS repeatedly advised the CASA, the CPS, and CPSS that she did not want to return to Plaintiff's custody and was happy and safe at the Greenwood home.

In March 2018, AS was reunited with Plaintiff with the understanding Plaintiff would comply with DPHHS rules and successfully complete the tasks required in an in-home safety plan she signed.  On April 16, 2018, Friedel LLC told CPS Jessica Moorhead that Plaintiff had tested positive for Methamphetamine and Amphetamine.  The same day, Plaintiff told Friedel LLC she would not make her scheduled drug patch change, she did not have access to transportation, and she would be in on April 18, 2018 to have her patch changed.  Moorhead and CPS Kasia Harvey went to Plaintiff's new home with Laurel Police Department (LPD) officers.  While waiting to pull onto the street where Plaintiff was residing, Moorhead saw Plaintiff driving a car.  The LPD officers parked their vehicles in front of Plaintiff's home.  Plaintiff noticed the vehicles, continued driving two blocks, and then turned right.  The LPD officers followed Plaintiff, who drove back to her home and parked her car.  When Plaintiff was asked why she was driving after stating she did not have a way to get to her drug patch appointment,

she stated she had just picked up the vehicle from a friend.

The LPD officers and Moorhead approached Plaintiff after she exited her vehicle.  Moorhead informed Plaintiff she had tested positive for illegal drug use and asked Plaintiff to hand AS to Harvey.  Plaintiff denied any drug use and claimed positive drug test was from contamination of her new home or a contaminated mattress she had been sleeping on.  Plaintiff agreed to a Draeger test, which was negative.  AS was removed from Plaintiff's because of Plaintiff's non-compliance with the in-home safety plan, moving to a new home without notice, testing positive for methamphetamine and amphetamine, missing the scheduled patch change appointment, being dishonest about access to transportation, and claim that her new home or mattress were contaminated.

On April 18, 2018, Deputy County Attorney Paul Vestal filed a Motion for Court Findings On Out-Of-Home Placement Of Child, which requested a hearing. The same day, the district court entered an Order setting a hearing for May 7, 2018 and stating: "1. The Department retains Emergency Protective Services of the above-named Youth. The Department shall continue to have custody of the Youth pending the hearing. 2. Continuation of the child in the home would be contrary to the welfare of the child at this time . . ."

On April 20, 2018, GS ran away from the Greenwood home and called

Plaintiff to pick her up.  GS advised CPSS Jenn Weber that she was "ready" to be home, wanted to stay with Plaintiff, and would likely run away again if she were forced to return to the Greenwood home.  Based on this information, GS was placed with Plaintiff at that time. The May 2, 2018 CASA report to the Court notes that on April 30, 2018 the CASA visited GS at Plaintiff's home and that GS advised her she felt safe and wanted to remain there.  The CASA recommended GS "be allowed to remain in the care of [Plaintiff] with safety resources already in place."  She also recommended AS be reunited with Plaintiff and GS as Plaintiff had "completed counseling, parenting classes, supervised parenting time, group sessions, the drug patch and random urine drug tests."

On May 14, 2018, the district court dismissed the two Petitions upon motion of Deputy County Attorney Paul Vestal.

## II.    Basis for Federal Jurisdiction And Venue

Jurisdiction: 28 U.S.C. §§ 1331, 1343; U. S. Constitution; 42 U.S.C. § 1983.

Venue: 28 U.S.C. § 1343(b)(2); L.R. 3.2(b); MCA § 25-2-122(1)(b).

## III.   Factual And Legal Basis Of Each Defense

To the extent Plaintiff is claiming injury due to the warrantless removal of AS from Plaintiff's care on April 16, 2018, the social workers involved in that decision are entitled to absolute immunity because state district court orders in

place at the time 1) authorized them "to place the child[ren] in temporary . . . out-of-home care" and "to effectuate any other temporary disposition that may be required in the best interests of the child[ren]," granted DPHHS emergency protective services, and ordered that DPHHS "shall continue to have custody of the Youth pending the Hearing."  Alternatively, the social workers involved in that decision are entitled to qualified immunity because they reasonably believed 1) based on the aforesaid court orders, they had authority to remove AS from Plaintiff's care without a warrant, and/or 2) exigent circumstances existed in that Plaintiff had tested positive for illegal drug usage and insisted her home, where AS was living, was contaminated with methamphetamine.

To the extent Plaintiff is claiming injury due to the initiation, pursuit, and resolution of the child neglect and abuse proceedings in state court, the social workers involved in those proceedings are absolutely immune from suit.  *Meyers v. Contra Costa County Dept. of Soc. Servs.*, 812 F.2d 1154, 1156-57 (9th Cir. 1987).

To the extent Plaintiff is claiming injury due to Ciera Rash's Affidavit, Rash is entitled to qualified immunity because she did not lie, fabricate, or suppress material facts in her Affidavit.  *Smith v. Banner Health Sys.*, 621 Fed. Appx. 876, 881-82 (9th Cir. 2015); *Beltran v. Santa Clara Cnty*, 389 Fed. Appx. 679, (9th Cir. 2010); *Mabe v. San Bernardino Cnty*, 237 F.3d 1101, 1109 (9th Cir. 2001).

To the extent Plaintiff is claiming injury due to the execution of the state district court's orders, the social workers involved in the execution of those orders are absolutely immune from suit.  Coverdell v. Dept. of Soc. & Health Srvcs., 834 F.2d 758, 764-65 (9th Cir. 1987).

To the extent Plaintiff is claiming injury due to the state district court's orders, her claims are barred by the *Rooker-Feldman* doctrine and the rule against collateral attacks on another court's orders or judgments.

To the extent Plaintiff is claiming injury due to the placement of GS and AS in the Greenwood home, the social workers involved in that decision are entitled to absolute immunity (*Barnes v. Placer Cnty.*, 386 Fed. Appx. 633, (9th Cir. 2010); *Mabe v. San Bernardino County*, 237 F.3d 1101, 1109 (9th Cir. 2001); *Coverdell*, *supra*) or qualified immunity because, based on the facts they knew during the placement, they did not act with such deliberate indifference as to shock the conscience (*Pers. Rep. of the Estate of C. J. P. v. Washington*, 913 F.3d 831, 837-839 (9th Cir. 2019); *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010)).

To the extent Plaintiff is claiming injury due to any other actions of the social workers involved in this case, the social workers are entitled to qualified immunity because their actions did not violate Plaintiff's clearly established

constitutional rights and they did not act with such deliberate indifference as to shock the conscience.

Supervisors are not liable for any constitutional violations she alleges against them unless she proves they directed or participated in the violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Plaintiff lacks standing to claim injury for persons other than her. *Mabe v. San Bernardino Cnty*, 237 F.3d 1101, 1111-12 (9th Cir. 2001).

## IV.   Computation Of Damages

N/A

## V.   Pendency Or Disposition Of Any Related State Or Federal Litigation

Cause No. CV 17-156-BLG-SPW-TJC and CV 18-90-BLG-SPW-TJC are related and ongoing.  State district court Cause Nos. DN-17-427 and DN 17-428 (Yellowstone County) have been dismissed.

## VI.   Proposed Stipulations Of Fact

Defendants may stipulate to some of the facts set forth in Section I above.

## VII.   Controlling Issues Of Law Suitable To Pretrial Disposition

Some or all of the defenses discussed in Section III of this Preliminary Pretrial Statement may be suitable for pretrial disposition.

///

**VIII.  Persons Known Or Believed To Have Information That May Be Used In Proving Defenses And Summary Of Information**

Ciera Rash was the primary investigator regarding the abuse and neglect report DPHHS received, was involved in the decision to remove GS and AS from Plaintiff's care and to file the two Petitions discussed in Section I above, and was involved in providing some post-removal services to Plaintiff, GS, and AS.

Jessica Moorhead, Kasia Harvey, and Jenn Weber were involved in the decision to remove AS from Plaintiff's care on April 16, 2018.

Jason Larson and Jenn Weber were involved in reviewing the placement of GS and AS in the Greenwood home and had some involvement in providing post-removal services to Plaintiff, GS, and AS.

Laura Smith and Steve Bullock did not direct or participate in any constitutional violations Plaintiff alleges.

**IX.   Status Of Any Settlement Negotiations**

To date, no settlement discussions have taken place.

DATED this 16th day of September, 2019.

/s/ Michael R. King
Attorney for Defendants Laura Smith, Jason Larson, Jenn Weber, Kasia Harvey, Jessica Moorhead, and Steve Bullock

## <u>CERTIFICATE OF SERVICE L.R. 5.2(b)</u>

I hereby certify that, on September 16, 2019, a copy of the foregoing was served on the following persons by the following means:

| | |
|---|---|
| 1, 3, 4 | CM/ECF |
| _____ | Hand Delivery |
| _____ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| 2 | E-Mail |

1.  Clerk, U.S. District Court, Billings Division

2.  Krissy Sanchez -- Keepgrindin702@gmail.com (*Pro se* Plaintiff)

3.  Randall G. Nelson
    2619 St. Johns Avenue, Ste. E
    Billings, MT  59102

4.  Thomas C. Bancroft
    2619 St. Johns Avenue, Ste. E
    Billings, MT  59102

   /s/ Michael R. King
Laura Smith, Jason Larson, Jenn Weber, Kasia Harvey, Jessica Moorhead, and Steve Bullock